322 F.3d 115
 The SHAW GROUP INC., Stone & Webster, Inc., and Stone & Webster Asia, Inc., Petitioners-Appellees/Cross-Appellants,
v.
TRIPLEFINE INTERNATIONAL CORPORATION, Respondent-Appellant/Cross-Appellee.
 Docket No. 01-9038.
 Docket No. 01-9352.
 United States Court of Appeals, Second Circuit.
 Argued: December 13, 2002.
 Decided: March 4, 2003.
 
 COPYRIGHT MATERIAL OMITTED William J.T. Brown, LeBoeuf, Lamb, Greene & MacRae, LLP, New York, NY, for Respondent-Appellant/Cross-Appellee.
 Judith A. Lockhart, Carter, Ledyard & Milburn (William F. Sondericker, Gerald W. Griffen, of Counsel), New York, NY, for Petitioners-Appellees/Cross-Appellants.
 Before: KEARSE, SACK, and RAGGI, Circuit Judges.
 RAGGI, Circuit Judge.
 
 
 1
 Appellant Triplefine International Corporation ("Triplefine") appeals from an order of the District Court for the Southern District of New York (Lawrence M. McKenna, Judge) dated October 17, 2001, enjoining it from claiming as contract damages in arbitration those attorneys' fees and costs incurred in opposing motions to stay arbitration made by appellees Stone & Webster, Inc. ("Stone & Webster"), its affiliate, Stone & Webster Asia, Inc. ("S & W Asia"), and their parent company, The Shaw Group Inc. ("Shaw"), in the state and federal courts. Triplefine submits that the injunction should be vacated because the district court erred in (1) holding that the arbitrability of Triplefine's claim for fees and costs was an issue for the court rather than the arbitrator, and (2) concluding that the claim was outside the scope of the arbitration agreement. Stone & Webster, S & W Asia, and Shaw cross-appeal from the district court's order dated April 11, 2002, staying the injunction against Triplefine pending resolution of this appeal or an arbitral award on the fee claim.
 
 
 2
 Because the arbitration agreement at issue in this case provides for all disputes between the parties to be referred to the International Chamber of Commerce ("ICC"), and because the rules of that organization expressly provide for the International Court of Arbitration ("ICA") to resolve in the first instance any disputes about its own jurisdiction, we conclude that the arbitrability of Triplefine's contract claim for attorneys' fees and costs was a question for the arbitrator rather than the court. Accordingly, we vacate the district court's injunction.
 
 I. Background
 
 3
 The issue on appeal concerns one aspect of a complex commercial dispute that has presented the district court with a host of motions, cross-motions, and motions for reconsideration over many months. We discuss only those facts necessary to place our decision in context.
 
 
 4
 A. The Triplefine Agreement with Stone & Webster International
 
 
 5
 Triplefine is a Taiwan corporation that on November 9, 1993 entered into a contract ("the Representation Agreement") with Stone & Webster International Corporation ("Stone & Webster International"), a Delaware corporation, to assist with the latter's business projects in Taiwan, notably, the construction of a nuclear power plant for the Taiwan Power Company. Pursuant to section III, paragraph 15, of the Representation Agreement, the parties agreed to submit any disputes concerning or arising out of their contract to the ICC for arbitration.
 
 
 6
 On June 2, 2000, with the Taiwan plant only partially completed, Stone & Webster International filed for federal bankruptcy protection in the District of Delaware. Its assets and liabilities were acquired at auction in mid-July, 2000, by a Louisiana corporation, Shaw, which in turn arranged for their formal assumption by Shaw's newly created subsidiary, Stone & Webster. In connection with this acquisition, and pursuant to 11 U.S.C. § 365 (1994), Stone & Webster International rejected its contract with Taiwan Power, and a new contract to complete the power plant was entered into by another Shaw subsidiary, S & W Asia.
 
 
 7
 Soon thereafter, on July 27, 2000, Stone & Webster International advised Triplefine that it was cancelling the Representation Agreement, which in turn prompted Triplefine to file a bankruptcy claim against Stone & Webster International for approximately $1.5 million. Later that same year, Triplefine attempted to garnish Stone & Webster International's assets in Taiwan, but the bankrupt corporation persuaded a Taiwan tribunal that Triplefine was first obligated to arbitrate the parties' dispute pursuant to the Representation Agreement.
 
 B. Triplefine Files for Arbitration
 
 8
 On April 17, 2001, Triplefine filed a request for arbitration with the ICC, naming as respondents not only Stone & Webster International, but also Shaw, Stone & Webster, and S & W Asia. Before filing an answer to the arbitration notice, Shaw, Stone & Webster, and S & W Asia, on May 14, 2001, petitioned the New York Supreme Court to stay the arbitration. Shaw and S & W Asia asserted that they were not bound by the Representation Agreement, and Stone & Webster submitted that it should not be required to arbitrate a claim then pending in the bankruptcy court. Triplefine promptly removed the action to the United States District Court for the Southern District of New York.
 
 C. The District Court Decisions
 
 9
 1. The August 1, 2001 Order Denying a Stay of Arbitration Between Triplefine and Stone & Webster
 
 
 10
 After reviewing extensive written submissions and hearing argument, the district court, in an unpublished Memorandum and Order dated August 1, 2001, denied Stone & Webster's motion to stay arbitration with Triplefine. Shaw Group, Inc. v. Triplefine Int'l Corp., No. 01 Civ. 4273, 2001 WL 883076 (S.D.N.Y. filed Aug. 3, 2001). Relying on our decision in Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776-79 (2d Cir.1995) (discussing theories on which non-signatories can be bound to arbitration agreements), the court concluded that Stone & Webster, by assuming the assets of Stone & Webster International, had obligated itself to comply with the arbitration provision of the Representation Agreement regarding any dispute over monies due Triplefine on the Taiwan power plant project. Further, because Stone & Webster was not itself a bankrupt entity, the court declined to stay ICC arbitration pending the outcome of Stone & Webster International's bankruptcy proceedings. On the other hand, because the district court found no evidence that Shaw or S & W Asia had assumed or directly benefitted from the Representation Agreement, it granted these parties' motion to stay arbitration with Triplefine.
 
 
 11
 On this appeal, the parties challenge none of these rulings.[1] Instead, they focus on ensuing events and orders.
 
 
 12
 2. The October 17, 2001 Order Enjoining Triplefine from Pursuing an Arbitration Claim for Attorneys' Fees and Costs
 
 
 13
 On August 15, 2001, Triplefine amended its ICC arbitration request to charge Stone & Webster with breaching the Representation Agreement by pursuing a court stay of arbitration. It sought damages in an amount equal to its attorneys' fees and costs in opposing the stay motions.
 
 
 14
 Stone & Webster, Shaw, and S & W Asia moved to enjoin Triplefine from pursuing its amended arbitration claim. In an unpublished Memorandum and Order dated October 17, 2001, the district court granted appellees' motion. See Shaw Group, Inc. v. Triplefine Int'l Corp., No. 01 Civ. 4273, 2001 WL 1246583 (S.D.N.Y. filed Oct. 18, 2001). Preliminarily, it found that the arbitrability of Triplefine's claim for fees and costs was a question for the court since the parties had not expressly committed the issue to the arbitrator in their Representation Agreement. Id. at *2. The court then concluded that Triplefine's claim was not arbitrable because it did "not concern or arise out of the agreement containing the arbitration clause, but rather, it concern[ed] and ar[ose] out of separate, if related, court proceedings." Id.
 
 
 15
 3. The April 11, 2002 Order Staying the October 17, 2001 Injunction
 
 
 16
 On reconsideration, the district court refused to vacate its injunction, but granted Triplefine's request for a stay until this appeal was decided or an arbitral award was entered, whichever occurred earlier. Shaw Group Inc. v. Triplefine Int'l Corp., No. 01 Civ. 4273, 2002 WL 553733, at *1 (S.D.N.Y. filed Apr. 12, 2002).
 
 II. Discussion
 
 17
 We review de novo the district court's conclusion that it rather than an arbitrator should decide the arbitrability of Triplefine's claim for attorneys' fees and costs. See Bell v. Cendant Corp., 293 F.3d 563, 565-66 (2d Cir.2002) (and cases cited therein).
 
 A. Arbitrability
 
 18
 The arbitration clause at issue in this case is found at section III, paragraph 15, of the parties' Representation Agreement, which provides as follows:
 
 
 19
 15. All disputes between you [Triplefine] and us [Stone & Webster[2]] concerning or arising out of this Agreement shall be referred to arbitration to the International Chamber of Commerce, New York, New York, in accordance with the rules and procedures of International Arbitration. This Agreement and the rights and obligations of the parties shall be construed in accordance with and governed by the laws of New York.
 
 
 20
 Because this provision is part of a contract affecting interstate and international commerce, it is governed by the Federal Arbitration Act ("FAA"). See 9 U.S.C. §§ 1, 2 (1999); Allied-Bruce Terminix Companies v. Dobson, 513 U.S. 265, 273-81, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir.1996). Pursuant to the FAA, the role of courts is "limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate." PaineWebber Inc. v. Bybyk, 81 F.3d at 1198.
 
 
 21
 In addressing these issues, courts are mindful that "arbitration is a matter of contract," AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), and that parties cannot be compelled to arbitrate issues that they have not specifically agreed to submit to arbitration, First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Whether parties have obligated themselves to arbitrate certain issues, including the question of arbitrability, is determined by state law. See id. at 944, 115 S.Ct. 1920; Bell v. Cendant Corp., 293 F.3d at 566. Nevertheless, under the FAA, certain presumptions inform the analysis. Specifically, the federal policy in favor of arbitration requires that "any doubts concerning the scope of arbitrable issues" be resolved in favor of arbitration. Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25, 103 S.Ct. 927. An important exception applies, however, when the doubt concerns who should decide arbitrability. The law then reverses the presumption to favor judicial rather than arbitral resolution. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. at 944-45, 115 S.Ct. 1920. Thus, as federal case law makes plain, "the issue of arbitrability may only be referred to the arbitrator if `there is "clear and unmistakable" evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator.'" Bell v. Cendant Corp., 293 F.3d at 566 (emphasis in original) (quoting PaineWebber Inc. v. Bybyk, 81 F.3d at 1198-99 (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. at 944)).
 
 
 22
 New York law follows the same rule, i.e., it acknowledges the "well settled proposition that the question of arbitrability is an issue generally for judicial determination," but at the same time it recognizes an "important legal and practical exception" when parties "evince[ ] a `clear and unmistakable' agreement to arbitrate arbitrability." Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 45-46, 666 N.Y.S.2d 990, 993, 689 N.E.2d 884 (1997). Thus, to the extent appellees submit that the parties' choice of New York law in paragraph 15 of their agreement references a stricter state law standard with respect to the issue of who determines arbitrability, they are mistaken. On this point, federal and New York law are the same. Id. (citing AT & T Technologies, First Options, and Bybyk in concluding "that these assembled authorities have fashioned a balanced and sound view" of "the arbitrability inclusive exception").
 
 
 23
 B. Deciding Arbitrability Under the Representation Agreement
 
 
 24
 In PaineWebber Inc. v. Bybyk, we identified certain principles of New York contract law relevant to determining whether an arbitration agreement clearly and unmistakably demonstrates that arbitrators rather than the courts are to resolve questions of arbitrability: (1) "[i]n interpreting a contract, the intent of the parties governs;" (2) "[a] contract should be construed so as to give full meaning and effect to all of its provisions;" (3) words and phrases in a contract should be "given their plain meaning;" and (4) ambiguous language should be construed against the interest of the drafting party. 81 F.3d at 1199 (and cases cited therein). Applying these principles to the Representation Agreement, which was drafted by Stone & Webster International, we conclude that the evidence manifests the parties' clear and unmistakable intent to submit questions of arbitrability to arbitration.
 
 
 25
 First, the agreement plainly states the parties' intent to submit "[a]ll disputes ... concerning or arising out of" the Representation Agreement to arbitration. In PaineWebber Inc. v. Bybyk, we held that even absent an express contractual commitment of the issue of arbitrability to arbitration, a referral of "any and all" controversies reflects such a "broad grant of power to the arbitrators" as to evidence the parties' clear "inten[t] to arbitrate issues of arbitrability." Id. at 1199-1200. Citing approvingly to PaineWebber, the New York Court of Appeals reached the same conclusion in Smith Barney Shearson Inc. v. Sacharow, holding that language providing for "[a]ny controversy" between the parties to be "settled by arbitration," was sufficiently "plain and sweeping" to indicate an intent to have arbitrability decided by the arbitrators, 91 N.Y.2d at 43, 46, 666 N.Y.S.2d at 991, 994, 689 N.E.2d 884.
 
 
 26
 In this case, the parties' duty to arbitrate "all disputes" is qualified only by the requirement that the matter be one "concerning or arising under" the Representation Agreement. The dispute that brings the parties before us undoubtedly concerns the Representation Agreement in that it focuses on (1) whether moving for a court stay of arbitration constitutes a breach of paragraph 15, and (2) whether attorneys' fees and costs constitute compensable damages for such a breach. Appellees may well have various New York law defenses to Triplefine's claim, see, e.g., N.Y. C.P.L.R. § 7513 (McKinney 1998) (stating that attorneys' fees shall not be awarded in arbitration unless agreement to arbitrate so provides), but that does not alter the conclusion that the claim concerns the Representation Agreement. As we have previously ruled, the proper remedy under such circumstances "is to defend the arbitration" by invoking the applicable state law, "not to enjoin arbitration altogether." PaineWebber Inc. v. Bybyk, 81 F.3d at 1200; accord Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d at 46, 666 N.Y.S.2d at 993, 689 N.E.2d 884 (quoting PaineWebber).
 
 
 27
 Second, the parties' intent to arbitrate arbitrability is further evidenced by their agreement to refer all disputes to "the International Chamber of Commerce ... in accordance with the rules and procedures of International Arbitration." Whatever ambiguity there may be in identifying all "rules and procedures of International Arbitration," appellees do not contest that, at a minimum, the parties understood the "rules" to include those of the ICC itself. Article 6, section 2, of those rules ("ICC Rule 6.2") specifically provides for the ICA, the arbitral body of the ICC, to address questions of arbitrability, either sua sponte before an answer is filed or at the specific request of any party. That rule states:
 
 
 28
 If the Respondent does not file an Answer... or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the [ICA] Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is prima facie satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself. If the [ICA] Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.
 
 ICC Rule 6.2 (1998).[3]
 
 29
 The First Circuit cited this language in concluding that parties who contracted for arbitration in accordance with ICC rules had thereby agreed to submit questions of arbitrability to the arbitrator. See Apollo Computer, Inc. v. Berg, 886 F.2d 469, 472-73 (1st Cir.1989); accord Daiei, Inc. v. United States Shoe Corp., 755 F.Supp. 299, 303 (D.Haw.1991) (relying on Apollo Computer to hold that even where an agreement "does not specifically assign the determination of arbitrability to the arbitrator," a provision to have all disputes resolved according to ICC rules evidences the parties' "agree[ment] to let the arbitrator decide questions of arbitrability"). We reached a similar conclusion in PaineWebber Inc. v. Bybyk with respect to arbitration clauses incorporating the rules of another entity, the National Association of Securities Dealers ("NASD"), which committed "all issues, including issues of arbitrability and timeliness, to the arbitrators." 81 F.3d at 1202. The New York Court of Appeals has also held that an agreement to have NASD rules govern arbitration evidences "the parties' intent and commitment to arbitrate the issue of arbitrability." Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d at 46-47, 666 N.Y.S.2d at 994, 689 N.E.2d 884.
 
 
 30
 Appellees contend that the Representation Agreement's inclusion of two choice-of-law clauses nevertheless precludes a finding that the parties intended to submit the question of arbitrability to the ICA. In addition to paragraph 15, which we have already quoted, section III, paragraph 16, of the Representation Agreement states:
 
 
 31
 16. This Agreement shall be deemed to have been executed and delivered in New York, New York, and shall be interpreted and construed in accordance with the laws of New York, U.S.A.
 
 
 32
 Appellees submit that the reference to New York law in paragraph 16 is a general choice-of-law clause intended to resolve potential conflicts as to the interpretation and construction of the contract, and that the reference to New York law in paragraph 15 must serve some other purpose. They urge us to conclude that paragraph 15 incorporates New York arbitration law into the agreement, particularly its law with respect to arbitrability, with international arbitration rules referenced simply to govern arbitration procedure. We reject this argument for several reasons.
 
 
 33
 First, the plain language of paragraph 15 does not evidence an intent to incorporate New York arbitration law into the parties' agreement. In Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 60-64, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), the Supreme Court expressly ruled that the mere inclusion of a choice-of-law provision in an arbitration provision does not thereby incorporate state arbitration law. Accord National Union Fire Ins. Co. v. Belco Petroleum Corp., 88 F.3d 129, 134-35 (2d Cir.1996). To the extent the New York Court of Appeals suggested otherwise in Smith Barney, Harris Upham & Co. v. Luckie, 85 N.Y.2d 193, 202, 623 N.Y.S.2d 800, 805, 647 N.E.2d 1308 (1995), we observed in PaineWebber Inc. v. Bybyk, 81 F.3d at 1200, that Luckie has been seriously undermined by Mastrobuono. Indeed, since Mastrobuono, the New York Court of Appeals has limited Luckie to its specific facts, which notably included a choice-of-law provision applicable to the "enforcement" as well as the construction of the contract. See Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d at 48, 666 N.Y.S.2d at 995, 689 N.E.2d 884. We need not here decide whether to adopt this effort to reconcile Mastrobuono and Luckie. Cf. Coleman & Co. Securities, Inc. v. Giaquinto Family Trust, No. 00 Civ. 1632, 2000 WL 1683450, at *3 (S.D.N.Y. Nov.9, 2000) (holding that provision for "agreement and its enforcement" to be governed by New York law did not evidence parties' intent to be bound by New York arbitration law). It suffices to note that paragraph 15 of the Representation Agreement nowhere provides for New York law to govern the "enforcement" of the parties' contract. It invokes New York law only to assist in construing the agreement and the parties' rights and obligations thereunder, subjects for state contract, not arbitration, law.
 
 
 34
 Second, the fact that paragraph 15 and paragraph 16 both contain choice-of-law clauses does not incorporate New York arbitration law into the parties' agreement. Those district court cases cited to us by appellees containing dual choice-of-law clauses are easily distinguishable. For example, in Insurance Co. of North America v. ABB Power Generation, Inc., 925 F.Supp. 1053, 1057 (S.D.N.Y.1996), the parties provided for California law to govern the construction of their contract but for their agreement to arbitrate to be "enforceable under the prevailing arbitration laws of the State of New York." (emphasis added). Similarly in Coleman & Co. Securities, Inc. v. Giaquinto Family Trust, 2000 WL 1683450, at *1, the parties provided for "arbitration" to be "conducted pursuant to ... the laws of the State of New York," not just, as in this case, for the agreement to be construed in accordance with state law.
 
 
 35
 In interpreting the parties' Representation Agreement, we are, of course, obliged to give "full meaning and effect to all of its provisions." American Express Bank Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990) (quoted in PaineWebber Inc. v. Bybyk, 81 F.3d at 1199). Further, we recognize that "[u]nder New York law an interpretation of a contract that has `the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'" Galli v. Metz, 973 F.2d 145, 149 (2d Cir.1992) (quoting Garza v. Marine Transport Lines, Inc., 861 F.2d 23, 27 (2d Cir.1988)). Nevertheless, in following these principles we are not free to alter the plain terms of an agreement or to strain language beyond its reasonable and ordinary meaning. See Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir.1990). Paragraph 15, in broadly mandating arbitration, provides simply that the "[a]greement" and the "rights and obligations" of the parties thereunder be construed in accordance with New York law. Paragraph 16, after ensuring New York venue, is almost duplicative in requiring the agreement to be interpreted and construed in accordance with New York law. Nothing in this boilerplate language, whether read together or separately, so much as hints at an intent to constrain the broad powers conferred on the arbitrator to resolve "all disputes" between the parties, much less to limit the application of ICC Rule 6.2. See Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d at 47, 666 N.Y.S.2d at 994, 689 N.E.2d 884 (holding that "[a] boilerplate choice of law clause does not necessarily signify the parties' acceptance of limitations imposed by New York law with respect to contractually conferred power on an arbitrator to determine all issues, including arbitrability"). Instead, the duplication suggests only a certain carelessness in drafting. Cf. International Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 86 n. 3 (2d Cir.2002) (recognizing that extraneous contract language may sometimes evidence careless drafting).
 
 
 36
 In any event, appellees' choice-of-law argument is of no practical import. As we have already discussed, federal and New York law both follow the same principles when deciding whether the parties to an arbitration agreement have clearly and unmistakably indicated an intent to arbitrate arbitrability. Neither our analysis nor our decision to vacate the district court's injunction would be different if we were to find that paragraph 15 references New York arbitration as well as contract law.
 
 
 37
 In sum, because the parties' arbitration agreement is broadly worded to require the submission of "all disputes" concerning the Representation Agreement to arbitration, and because it provides for arbitration to be conducted under the rules of the ICC, which assign the arbitrator initial responsibility to determine issues of arbitrability, we conclude that the agreement clearly and unmistakably evidences the parties' intent to arbitrate questions of arbitrability. We hold that Triplefine should not have been enjoined from pursuing its amended arbitration claim for breach of contract against Stone & Webster. Rather, the district court should have deferred to the arbitrator on the parties' dispute about the arbitrability of that claim.
 
 III. Conclusion
 
 38
 The district court's October 17, 2001 order enjoining Triplefine from pursuing an amended arbitration claim against Stone & Webster for breach of the duty to arbitrate and for an award of attorneys' fees and costs is hereby VACATED.
 
 
 
 Notes:
 
 
 [1]
 Triplefine initially appealed the order staying arbitration against Shaw and S & W Asia, but withdrew the appeal when, on reconsideration, the district court clarified that its injunction was preliminary rather than permanentSee Shaw Group, Inc. v. Triplefine Int'l Corp., No. 01 Civ. 4273, 2001 WL 1246583, at *1 (S.D.N.Y. filed Oct. 18, 2001). Stone & Webster cross-appealed from the district court's refusal to stay arbitration in favor of bankruptcy proceedings, but withdrew that appeal when, on November 22, 2002, the bankruptcy court decided to abstain on Triplefine's claim against Stone & Webster in favor of ICC arbitration.
 
 
 [2]
 Because Stone & Webster does not appeal from the district court's ruling that it succeeded to Stone & Webster International's rights and duties under the Representation Agreement, this court will refer to Stone & Webster as if it had been an original signatory to the agreement
 
 
 [3]
 The ICA invoked ICC Rule 6.2 in its June 22, 2001sua sponte ruling that Triplefine's initial arbitration claim could be pursued as against Stone & Webster International, but not as against Shaw, Stone & Webster, and S & W Asia. Because the parties were already before the district court on appellees' motion to stay, Triplefine did not need to initiate court proceedings pursuant to the last sentence of ICC Rule 6.2 to seek review of the arbitrator's decision. Whether these circumstances will hinder Triplefine from establishing that Stone & Webster breached a duty to arbitrate or that court-incurred attorneys fees' and costs constitute compensable damages for any such breach are questions we leave to the arbitrator. See In re Chung, 943 F.2d 225, 230 (2d Cir.1991) ("[I]n deciding whether the parties have agreed to submit particular claims to arbitration, we do not rule on the merits of the underlying disputes themselves.").